IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WALTER VAN DOREN, et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COE PRESS EQUIPMENT CORP., et al., | : | |
| Defendants. | : | NO. 06-CV-02835 |

MEMORANDUM

_____

I.      BACKGROUND

From approximately 2004 to 2006, Plaintiff Walter Van Doren ("Van Doren") was an

employee of Columbia Lighting LCA, Inc., in Bristol, Pennsylvania ("Columbia Bristol").  His

duties included operating machines used to make housings for lights.  One of the machines he

operated was a straightener machine, a machine used to straighten large coils of metal.  The

machine had two large metal rolls between which the metal would be pulled in order to be

straightened.  On May 2, 2006, Van Doren suffered an accident at work in which both of his

arms became trapped in the straightener machine.  According to Van Doren, in the minutes

preceding the accident he cleaned the machine in preparation for a project and then took a

cigarette break.  Upon returning from his break, Van Doren was walking in front of the machine

when his right hand suddenly became trapped between the rolls of the machine.  The machine

lifted him off the ground and pulled him in.  As he attempted to free his right hand using his left

hand, his left hand, too, became entrapped in the machine.  Van Doren screamed for help and

eventually his co-workers came to his assistance.  The workers attempted to extract Van Doren

from the machine.  When those efforts failed, a surgeon had to perform a field amputation,

removing both of Van Doren's arms while he was still trapped inside the machine.

The straightener machine involved in the accident was manufactured by Sesco, Inc.  The machine was originally built with a metal attachment called a stock support, which was used to guide material into the straightener.  According to Manufacturer Defendants, the stock support also acted as a guard by ensuring that the machine operator remained approximately 18 inches away from the "pinch point," namely the space between the machine's two rolls.  The machine's Operator's Maintenance Manual did not identify the stock support as a guard or safety feature.  In 1981, Columbia Lighting in Spokane, Washington, ("Columbia Spokane") purchased the machine.  At some point during the course of its ownership, Columbia Spokane removed the stock support from the machine and replaced it with a feeder tray.  In 2002, Colombia Spokane transferred the straightener to Columbia Bristol.  The straightener was conveyed with neither the stock support nor the feeder tray.

On June 28, 2006, Van Doren and his wife, Plaintiff Sandra Van Doren (together "Plaintiffs"), brought the present action in this Court.  The complaint named two sets of defendants: a group referred to as the "Manufacturer Defendants" and a group referred to as the "Prior Owner Defendants."  The Manufacturer Defendants are corporations that Plaintiffs allege were successors to the original manufacturer of the machine, Sesco, Inc.  The Prior Owner Defendants are corporations that owned or had at some point acquired Columbia Spokane and Columbia Bristol.

The Manufacturer Defendants named in Plaintiffs' complaint are Coe Press Equipment Corporation, Sesco Corporation, and Sesco Products Group, Inc.  In September 1999, Coe Press Equipment Corporation set up Sesco Acquisition Corporation, a wholly owned subsidiary, to

purchase limited assets from Sesco, Inc.  The purchase agreement included all the intellectual property of Sesco, Inc.; its customer, supplier, and advertising records; and a non-competition agreement.  Sesco Acquisition Corporation also purchased other manufacturing assets outside of the Asset Purchase Agreement, including computer equipment, electrical and mechanical inventory parts, and certain inventory.  Approximately one and a half years after the purchase, Sesco Acquisition Corporation transferred all of its acquired assets to Sesco Corporation.  In 2002, Sesco Corporation changed its name to Sesco Products Group.  Sesco Products Group remains a wholly-owned subsidiary of Coe Press Equipment.

The Prior Owner Defendants named in Plaintiff's complaint are Hanson PLC, Jacuzzi Brands, Inc., Columbia Spokane, Hubbell Lighting, Inc., and Hubbell Incorporated.  On September 4, 2007, this Court issued an Order granting Defendant Hanson PLC's motion to dismiss for lack of personal jurisdiction.  Jacuzzi Brands, Inc., was the parent company of Columbia Spokane and Columbia Bristol until April 2002.  In April 2002, Columbia Spokane and Columbia Bristol were sold to another entity.  In 2004, Columbia Spokane and Columbia Bristol, through a series of mergers, became part of Hubbell Lighting, Inc.  Accordingly, Plaintiffs assert their negligence claims against Hubbell Lighting, Inc., as successor in interest to Columbia Spokane.  Hubbell Incorporated is the sole shareholder of Hubbell Lighting, Inc.

Manufacturer Defendants and Prior Owner Defendants moved for summary judgment on all of Plaintiffs' claims.

II.     LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court shall grant a motion for

3

summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The moving party bears the initial responsibility of identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  El v. SEPTA, 479 F.3d 232, 237 (3d Cir. 2007).  However, even if the moving party fulfills this requirement, "the non-moving party can defeat summary judgment if it nonetheless produces or points to evidence in the record that creates a genuine issue of material fact."  Id. at 238 (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993)).

In evaluating a motion for summary judgment, "the court must neither resolve factual disputes nor make judgments of credibility; instead, all '[i]nferences should be drawn in the light most favorable to the non-moving party.'"  Peloro v. U.S., 488 F.3d 163, 173 (3d Cir. 2007) (quoting Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1362 (3d Cir. 1992)). If the non-moving party's evidence contradicts the movant's, "then the non-movant's must be taken as true."  Big Apple BMW, Inc., 974 F.2d at 1363.  A non-moving party may not rely solely on mere pleadings or allegations to identify unresolved genuine issues of material fact. Fed. R. Civ. P. 56(e)(1); SEPTA, 479 F.3d at 238 (citing Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006)).  However, a non-moving party's affidavit is enough to present a genuine issue of fact if it clearly asserts a specific fact in question.  See Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).

III.     DISCUSSION

A.     Manufacturer Defendants

We turn first to Manufacturer Defendants' Motion for Summary Judgment.  The foregoing discussion will address four main issues.  Part 1 will address the appropriate choice of law to be used in this case.  Part 2 will discuss Plaintiffs' negligence, breach of warranty, and punitive damages claims.  Part 3 will analyze Plaintiffs' strict liability claim.  Finally, Part 4 will address whether Coe Equipment Corporation can be held liable under Plaintiffs' claims.

1.    Choice of Law

The parties in this matter disagree over whether this Court should apply Pennsylvania law or Michigan law in assessing Plaintiffs' claims against Manufacturer Defendants.  Accordingly, at the outset we must conduct a choice of law analysis.  Because this is a diversity case, we apply the choice of law rules of the forum state, namely Pennsylvania.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 226 (3d Cir. 2007).  The first step in a choice of law analysis under Pennsylvania law is to determine whether there is "an actual or real conflict between the potentially applicable laws."  Id. at 229-30.  If the jurisdictions' laws differ in relevant ways, "then the court should examine the governmental policies underlying each law, and classify the conflict as a 'true,' 'false,' or an 'unprovided-for' situation."  Id.  The choice of law analysis continues past that point only if the Court finds that there is a "true" conflict, namely if "both jurisdictions' interests would be impaired by the application of the other's laws."  Id.  If a true conflict exists, then the court must determine "which state has the greater interest in the application of its law."  Id. (internal citations omitted).

Both parties agree that there is a true conflict between Michigan law and Pennsylvania law in this case because the laws differ in the extent to which they recognize exceptions to the

traditional successor non-liability principle in a strict liability case.  (Manufacturer Defs.' Mot. 11-12; Pls.' Resp. to Manufacturer Def.'s Mot. 14.)  Both states' laws recognize the general rule that a successor that acquires the assets of another company by purchasing them for cash does not automatically assume the predecessor's liabilities.  Dawejko v. Jorgensen Steel Co., 434 A.2d 106, 107 (Pa. Super. Ct. 1981); Foster v. Cone-Blanchard Mach. Co., 597 N.W.2d 506, 509 (Mich. 1999).  Both states' laws recognize five traditional exceptions to that principle.[1]  We need not address those traditional exceptions here because both Plaintiffs and Manufacturer Defendants agree that they do not apply in this case.  (Manufacturer Defs.' Mot. 11-12; Pls.' Resp. to Manufacturer Def.'s Mot. 17-21.)  However, Pennsylvania recognizes an additional "product line" exception to successor non-liability principles.  That exception dictates that:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

Dawejko, 434 A.2d at 110.  The social policy interests reflected in this exception have been articulated as follows:

---

[1]     The traditional exceptions to successor non-liability recognized by Pennsylvania and Michigan Courts apply where:
> (1) the purchaser expressly or impliedly agrees to assume such obligation;
> (2) the transaction amounts to a consolidation or merger;
> (3) the purchasing corporation is merely a continuation of the selling corporation
> (4) the transaction is fraudulently entered into to escape liability; . . .
> [(5)] the transfer was without adequate consideration and provisions were not made for creditors of the transferor.

Dawejko, 434 A.2d at 107; See also Foster, 597 N.W.2d at 509.

> [T]he manufacturer rather than the factory employee is in the better
> position both to judge whether avoidance costs would exceed
> foreseeable accident costs and to act on that judgment. . . . because
> the manufacturer transfers to its successor corporation the resources
> that had previously been available to the manufacturer for meeting its
> responsibilities to persons injured by defects in products it had
> produced . . . the successor rather than the user of the product is in the
> better position to bear accident-avoidance costs.

Ramirez v. Amsted Industries, Inc., 86 N.J. 332, 352 (N.J. 1981) (internal quotations omitted).[2]

Michigan courts, on the other hand, have expressly rejected the product line exception in favor of

the traditional, narrower "continuity of enterprise" exception, which states that:

> [L]iability may attach to a corporation which acquires the
> manufacturer of the product where the totality of the acquisition
> demonstrates a basic continuity of the enterprise between the
> manufacturer and the acquiring corporation.[3]

Pelc v. Bendix Machine Tool Corp., 314 N.W.2d 614, 618 (Mich. Ct. App. 1981).  In rejecting

------------------------------------------

[2]    The Dawejko court, which first recognized the product line exception in
Pennsylvania, based its social policy considerations on the New Jersey Supreme Court decision
in Ramirez v. Amsted Industries, Inc., 86 N.J. 332 (N.J. 1981).  Dawejko 434 A.2d at 111.

[3]    In evaluating whether there is a continuity of the enterprise between the
predecessor and successor corporations, Michigan courts base their analysis on the following
guidelines:
> (1) There is a continuity of management, personnel, physical location,
> assets and general business operations of the selling corporation;
> (2) The selling corporation ceases its ordinary business operations,
> liquidates, and dissolves as soon as legally and practically possible;
> (3) The purchasing corporation assumes those liabilities and
> obligations of the seller ordinarily necessary for the uninterrupted
> continuation of normal business operations to the selling corporation;
> and
> (4) The purchasing corporation holds itself out to the world as the
> effective continuation of the seller corporation.

Pelc v. Bendix Machine Tool Corp., 314 N.W.2d 614, 618 (Mich. Ct. App. 1981)

the product line exception, the Court of Appeals of Michigan based its reasoning partly on the fact that Michigan "has not yet openly embraced strict liability as a theory of recovery for products liability." Id.  The court therefore found that "continued adherence to the doctrine of successor liability as evaluated [under the traditional exceptions] will . . . assure a uniform evolution of this area of the law most consistent and harmonious with the law and policy considerations of our jurisdiction." Id.  Therefore, it is clear that the laws of Pennsylvania and Michigan are directly at odds in their approach to the "product line" exception to successor non-liability.  Accordingly, because each state's recognized interests would be hindered by the application of the other state's laws, we find that there is a true conflict between the laws of both jurisdictions.

When there is a true conflict, Pennsylvania choice of law rules require that we apply the Second Restatement of Conflict of Laws as a starting point and then apply Pennsylvania's flexible interest analysis to determine which state has the greatest interest in having its law applied.  Berg Chilling Sys. v. Hull Corp., 435 F.3d 455, 463 (3d Cir. 2006) (applying Pennsylvania law).  To do so, we must first "characterize the particular issue before the court as one of tort, contract, or corporate law -- or some hybrid -- in order to settle on a given section of the Restatement for guidance." Id.  In the present case, Manufacturer Defendants contend that the issue of whether the product line exception should apply in this case should be characterized as a "contract/corporate law" issue because successor liability is "rooted in corporate law" and because there was a "lack of Third Circuit precedent on the issue."  (Manufacturer Defs.' Mot. 13.)  However, the case cited by Defendants for this proposition actually belies their argument. In Berg Chilling Sys. v. Hull Corp., the United States Court of Appeals for the Third Circuit

found that "[w]hile the basic tenet of successor liability is based in corporate law, the exceptions

span a loose substantive continuum from contract to corporate to tort law." 435 F.3d at 464.

Although the Berg court declined to "characterize the substantive law of the product line

exception," it did state that it was an "explicitly tort-based exception" that was "generally

analyzed using torts choice of law principles." Id. at 465. The product line exception has indeed

been traditionally analyzed as an issue of tort law. See, e.g., Kradel v. Fox River Tractor Co.,

308 F.3d 328 (3d Cir. 2002). Also, we find persuasive the fact that at least one U.S. Court of

Appeals has held that the product line exception is a matter of tort law, not corporate law. See

Ruiz v. Blentech Corp., 89 F.3d 320, 327 (7th Cir. 1996). Accordingly, we hold that the issue of

whether to apply the exception is a question of tort law.

Under the Pennsylvania choice of law approach, "for substantive tort law issues, . . .

[courts use] a combination of the 'government interest' and 'significant relationship'

approaches." Kirschbaum v. WRGSB Assocs., 243 F.3d 145, 150 (3d Cir. 2001) (citing Troxel

v. A.I. duPont Inst., 636 A.2d 1179, 1181 (Pa. Super. Ct. 1994)). Under that approach, "a court

applying Pennsylvania law should use the Second Restatement of Conflict of Laws as a starting

point, and then flesh out the issue using an interest analysis." Berg, 435 F.3d at 463. The

interest analysis requires us to "evaluate 'the extent to which one state rather than another has

demonstrated, by reason of its policies and their connection and relevance to the matter in

dispute, a priority of interest in the application of its rule of law.'" Kirschbaum, 243 F.3d at 150

(citing Troxel, 636 A.2d at 1181).

As the first step in our analysis, we consider the Restatement (Second) of Conflict of

Laws § 145, which establishes the "general principles to be applied and contacts to be taken into

account in choice of law determinations in tort actions."  Blakesley v. Wolford, 789 F.2d 236,

239 (3d Cir. 1986).  That section states:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6 [Choice-of-Law Principles].[4]
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> > (a) the place where the injury occurred,
> >
> > (b) the place where the conduct causing the injury occurred,
> >
> > © the domicile, residence, nationality, place of incorporation and place of business of the parties, and
> >
> > (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws §145 (1971).  We analyze each factor in turn.

In the present case, the injury occurred in Pennsylvania.  The conduct allegedly causing

the injury, namely the manufacture and sale of the defective machine, occurred in Michigan.  The

domicile of Plaintiffs is in Pennsylvania.  The incorporation and the place of business of

Manufacturer Defendants is in Michigan.  There was no true relationship between Plaintiffs and

---

[4]     Section 6 of the Restatement, titled Choice of Law Principles, lists the following factors:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6 (1971).

Manufacturer Defendants.  The only arguable "relationship" between the parties, namely Van

Doren's use of the straightener machine produced by Manufacturer Defendant's alleged

predecessor, Sesco, Inc., was based in Pennsylvania, where Van Doren worked.  Therefore, the

number of contacts for both states is roughly equal.  However, under Pennsylvania law, it is not

sufficient to conduct merely a "counting of contacts."  Hammersmith, 480 F.3d at 231.  Rather,

we must apply Pennsylvania's "interests/contacts" analysis, which combines both the

Restatement's analysis of the "contacts [between the States and the event] establishing

significant relationships," and a "qualitative appraisal of the relevant states' policies with respect

to the controversy."  Id.  This analysis requires a court to "weigh the contacts on a qualitative

scale according to their relation to the policies and interests underlying the particular issue."  Id.

(internal citations omitted).

In the present case, we find that Michigan's interest in having its law applied is no greater

than Pennsylvania's interest.  The public policy behind strict products liability is to "ensure that

the costs of injuries resulting from defective products are borne by the manufacturers . . . for the

risk of injury can be insured by the manufacturer and distributed among the public as a cost of

doing business."  Dawejko, 434 A.2d 106 at 109.  Courts have used that same rationale to

support the product line exception because:

> [T]he manufacturer transfers to its successor corporation the
> resources that had previously been available to the manufacturer for
> meeting its responsibilities to persons injured by defects in products
> it had produced . . . [and] the successor rather than the user of the
> product is in the better position to bear accident-avoidance costs.

Ramirez v. Amsted Industries, Inc., 431 A.2d 811, 821 (N.J. 1981).  The Pennsylvania Superior

Court decision that first recognized the product line exception embraced that rationale as articulated in Ramirez.  434 A.2d 106 at 111.  We find that Pennsylvania has a strong interest in protecting its citizens from defective products by ensuring that successor corporations that enjoy the benefit of continuing a predecessor's product line take responsibility for the harms that products within that line may cause.  On the other hand, the Michigan decision rejecting the product line exception identified the policy behind that decision as a desire to "assure a uniform evolution in this area of law" given Michigan's lack of recognition of strict products liability. Pelc, 314 N.W.2d at 620.  Defendant's have further characterized Michigan's interest as a choice to "enhance the protection of its successor corporation at the expense of plaintiffs with product liability claims."  (Manufacturer Defs.' Mot. 13.)  Weighing the contacts on "a qualitative scale according to their relation to the policies and interest at issue," we find that Michigan's interest in protecting its local successor corporations from liability for an accident occurring in Pennsylvania is no greater than Pennsylvania's interest in protecting its citizens injured by a defective product manufactured by a Michigan corporation.  In fact, we find that Michigan's interest in ensuring "a uniform evolution" in its local products liability law will not be greatly affected by an application in federal court of Pennsylvania law to an accident occurring in Pennsylvania and involving a Pennsylvania resident.

We also find that, given the great prevalence of inter-state commerce, Pennsylvania's interest in protecting its citizens against defective products will be greatly hindered if it is unable to hold out-of-state successor corporations liable for injuries suffered by its citizens resulting from accidents occurring within the state.  Defendants cite Cipolla v. Shaposka, 267 A.2d 854 (Pa. 1970), for the proposition that "it is only fair to permit a defendant to rely on his home

12

state's law when he is acting within that state." (Manufacturer Defs.' Mot. 16.)  In Cipolla, the

Pennsylvania Supreme Court declined the plaintiff's request to apply Pennsylvania law to an

automobile collision that occurred in Delaware with a Delaware resident when the plaintiff was

visiting Delaware.  Cipolla encourages "a territorial view of torts" and discourages the

withdrawal of "actions and affairs from the reach of domestic law because the persons (or at least

one of the persons) participating in them are not domestic to the state."  Cipolla, 267 A.2d at 857.

That territorial approach actually supports a finding that it is only fair to permit a local plaintiff to

rely on his home state's law when he is injured within that state, even if the injury is caused by a

machine manufactured outside the state.  Accordingly, we find that, under this territorial view,

Pennsylvania's contacts with the event are qualitatively more important because Pennsylvania

has a greater interest in protecting its citizens who are injured inside its territory by machines

manufactured outside the state.  Therefore, we will apply Pennsylvania law, which recognizes the

product line exception.

      2.     <u>Plaintiffs' Negligence, Breach of Warranty, and Punitive Damages Claims</u>

Defendants argue that the product line exception to successor non-liability only applies to

strict liability claims.  (Manufacturer Defs.' Mot. 28.)  Plaintiffs agree and assert that they will

not be pursuing negligence, breach of warranty, or punitive damages claims against Manufacturer

Defendants.  (Pls.' Resp. to Manufacturer Defs.' Mot. 28.)  Accordingly, we will grant summary

judgment in favor of Manufacturer Defendants on Counts I, III, and IV of Plaintiffs' Amended

Complaint.

      3.     <u>Strict Liability</u>

a.      Successor Liability

Plaintiffs bring their strict liability claim against Manufacturer Defendants based on Manufacturer Defendants' alleged status as successors to Sesco, Inc., the original manufacturer of the straightener machine.  Plaintiffs rest their strict liability claim on Pennsylvania's product line exception to successor non-liability.  The exception as interpreted by Pennsylvania courts states:

> [W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, and undertakes essentially the same manufacturing operation as the selling corporation, the purchasing corporation is strictly liable for injuries caused by defects in units of the same product line, even if previously manufactured and distributed by the selling corporation or its predecessor.

Dawejko, 434 A.2d at 110 (citing Ramirez, 431 A.2d at 825).  Accordingly, there are two initial factors that Plaintiffs must show before we can apply the exception in this case: (1) that the successor corporation acquired all or substantially all of the manufacturing assets of its predecessor; and (2) that the successor corporation undertook essentially the same manufacturing operation as its predecessor.  We will refer to these two factors as the Dawejko factors, as they were first adopted into Pennsylvania law by the Dawejko court.  In addition, the United States Court of Appeals for the Third Circuit has interpreted Pennsylvania's product line exception to have three additional prerequisites:

> (1) the virtual destruction of the plaintiff's remedies against the original manufacturer caused by the successor's acquisition of the business,
> (2) the successor's ability to assume the original manufacturer's risk-spreading rule, and

14

(3) the fairness of requiring the successor to assume a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business.

Kradel v. Fox River Tractor Co., 308 F.3d 328, 332 (3d Cir. 2002). These factors are commonly referred to as the Ray factors based on the decision that first outlined them, namely Ray v. Alad Corp., 560 P.2d 3 (Cal. 1977). Accordingly, to prevail in a successor liability claim premised upon the product line exception, a plaintiff must establish both the Dawejko factors and the Ray factors.

Courts applying the product line exception have consistently found that the question of whether each particular required factor has been satisfied is a question for the jury. Schmidt v. Boardman Co., 2008 PA Super 203 (Pa. Super. Ct. 2008) (holding that the plaintiff presented enough evidence at trial of each of the required factors to support the jury's conclusion that the factors had been met); see also Fehr v. C.O. Porter Mach. Co., 2003 U.S. Dist. LEXIS 18028 (E.D. Pa. Oct. 8, 2003) (finding that the plaintiff had submitted sufficient evidence from which a jury could find that each factor had been meet); Frantz v. Black & Decker Corp., 1996 U.S. Dist. LEXIS 8902 (E.D. Pa. June 26, 1996); Dawejko, 434 A.2d at 112. Therefore, at the summary judgment stage, we must determine whether Plaintiffs have presented sufficient evidence to raise a question of material fact as to each of the five required factors.

We turn first to the first Dawejko factor, which requires Plaintiffs to show that Manufacturer Defendants purchased "all or substantially all of Sesco, Inc.'s manufacturing assets." Dawejko, 434 A.2d at 110. Plaintiffs have presented evidence that, under the Asset Purchase Agreement executed between Sesco Acquisition Corporation and Sesco, Inc., Sesco

Acquisition Corporation  purchased all of the intellectual property of Sesco, Inc., including

"designs, prototypes, trade secrets, manufacturing and engineering drawings, process sheets . . .

and other industrial property."  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. N at ¶ 1.1.)

Manufacturer Defendants also purchased all of Sesco, Inc.'s customer, supplier, and advertising

records and lists as well as the right to use Sesco, Inc.'s name and its advertisements.  (Id., Ex. N

at ¶ 1.2-1.4.)  In addition, Plaintiffs presented evidence that Sesco Acquisition Corporation

purchased other manufacturing assets outside of the Asset Purchase Agreement, including

computer equipment, electrical and mechanical inventory parts, inventory related to what was

referred to as the "Ford Project," and plant equipment such as machines, machine parts, and

tools.  (Id., Ex. R.)  Plaintiffs also presented evidence that Werner Lehmann ("Lehmann"), the

original owner of Sesco, Inc., testified that his understanding was that he was selling his

company under the Asset Purchase Agreement.  (Id., Ex. Q at 23-24.)  We find that Plaintiffs

have presented sufficient evidence from which a reasonable juror could find that Sesco

Acquisition Corporation purchased "substantially all" of Sesco, Inc.'s manufacturing assets.

We turn now to the second Dawejko factor, under which Plaintiffs are required to show

that Manufacturer Defendants undertook essentially the same manufacturing operations as their

predecessor company.  In Schmidt v. Boardman Co., the Pennsylvania Superior Court found that,

to meet this requirement, a plaintiff need only present sufficient evidence that the successor

"continued to manufacture the same general line of business" and need not prove that the

successor continued to produce the same exact product.  2008 PA Super 203, P23 (Pa. Super. Ct.

2008).  The court in Schmidt based its reasoning on a California decision that found that, where

the products manufactured by the predecessor are customized, it is sufficient for a plaintiff to

show that the successor continued the "general business" of the predecessor.  Id. at 21 (citing Rawlings v. D. M. Oliver, Inc., 159 Cal. Rptr. 119 (Cal. App. 1979)).  In the present case, Manufacturer Defendants assert that the product line was not continued because the machines manufactured by Sesco, Inc., were customized.  (Manufacturer Defs.' Mot. 24.)  As in Schmidt, however, Plaintiffs here have presented sufficient evidence that Manufacturer Defendants continued to manufacture the same general line of business as Sesco, Inc.  For example, Plaintiffs presented evidence that Manufacturer Defendants hired an engineer from Sesco, Inc., to "continu[e] with the Sesco product work."  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. A at 44.)  In fact, at least eight former Sesco, Inc., employees were hired by Manufacturer Defendants to work exclusively on the Sesco line.  (Id., Ex. A at 135, 139.)  Also, one of Sesco, Inc.'s employees, who worked as a draftsman, testified that when he was hired by Defendant Manufacturers he spent approximately 80% of his time working on Sesco products.  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. F at 28.)  He also testified that Manufacturer Defendants did not apply any specific design improvements to the Sesco products.  (Id., Ex. F at 33.)  Also, John Charles Coe ("John Coe"), owner of Coe Press Equipment, testified that Manufacturer Defendants have the ability to produce any of the products previously manufactured by Sesco, Inc.  (Id., Ex. A at 82.)  Plaintiffs also presented evidence that, although the products were customized, the straightener machines were built based on existing models and had model numbers that reflected the basic parts of the design.  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. A at 72; Id., Ex. F at 108-110.)  Plaintiffs also point to evidence that Mr. Coe described the machines as being different designs within a product line.  (Pls.' Resp. to Manufacturer Defs' Mot., Ex. A at 83.)  We find that Plaintiffs have presented sufficient evidence to raise a question

17

as to whether Manufacturer Defendants undertook essentially the same manufacturing operations as Sesco, Inc.

With regard to the first Ray factor, we must determine whether Manufacturer Defendants' acquisition of Sesco, Inc.'s assets caused the virtual destruction of Plaintiffs' remedies against Sesco, Inc.  Plaintiffs have submitted evidence that the Asset Purchase Agreement required Sesco, Inc., to notify its customers that it was "terminating its business and its corporate existence and assigning to [Manufacturer Defendants seller Sesco, Inc.'s] relationship with its customers."  (Id., Ex. N at ¶ 6.9.)  According to Mr. Coe, Sesco, Inc., closed its doors about one week prior to the day that the Asset Purchase was signed and about five weeks after Mr. Coe first contacted Sesco, Inc., about purchasing its assets.  (Id., Ex. A at 140-41.)  Mr. Coe testified that at the time he met with Sesco, Inc., "they were in big trouble and didn't look like they were going to make it and . . . wanted to do a deal," which was the deal through which Manufacturer Defendants acquired Sesco, Inc.'s assets.  (Id., Ex. A at 142.)  Therefore, it appears from the evidence presented by Plaintiffs that Sesco, Inc., ceased doing business in connection with Manufacturer Defendants' purchase of its assets.  Accordingly, we find that Plaintiffs have presented sufficient evidence that the Purchase Agreement effectively terminated costumers' remedies against Sesco, Inc.

The second Ray factor requires Plaintiffs to show "the successor's ability to assume the original manufacturer's risk-spreading rule."  Kradel, 308 F.3d at 332.  This Court has found that, where a successor company acquired "all the parts and accessories, patterns and blueprints, client lists, and all other pertinent files from [the predecessor's original product] line, they acquired the ability to estimate the risks involved with the . . . line, and could have spread those

18

risks out to consumers in costs."  <u>Frantz</u>, 1996 U.S. Dist. LEXIS 8902, at *9.  In the present case, Manufacturer Defendants similarly acquired all "designs, prototypes, trade secrets, manufacturing and engineering drawings, process sheets . . . and other industrial property" from Sesco, Inc.  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. N at ¶ 1.1.)  Therefore, since they acquired all the intellectual property related to the Sesco, Inc.'s products, they had the ability to estimate the risks involved with the product and spread those risks out to consumers in costs.  Accordingly, we find that Plaintiffs have presented sufficient evidence to meet this factor.

The third <u>Ray</u> factor requires Plaintiffs to show that it is fair to require the successor company to assume "a responsibility for defective products that was a burden necessarily attached to the original manufacturer's good will being enjoyed by the successor in the continued operation of the business."  <u>Kradel</u>, 308 F.3d at 332.  In the present case, Plaintiffs have presented evidence that Manufacturer Defendants derived a benefit from the goodwill created by being associated with Sesco, Inc.  Plaintiffs pointed to evidence that the Asset Purchase Agreement required Sesco, Inc., to transfer to Manufacturer Defendants its "relationship with its customers."  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. N at ¶ 6.9.)  Also, Ron David, who had been chief engineer at Sesco, Inc., and was later hired by Manufacturer Defendants testified that he participated in sales calls with Coe salesman because "the Sesco name was well known in this industry and well respected and my name was attached to Sesco for many years."  (<u>Id.</u>, Ex. T at 98.)  He further testified that the purpose of his participation in the sales calls was to "introduc[e] Coe to our old customers as well as introduc[e] Sesco to their customers."  (<u>Id.</u>)  Plaintiffs also presented evidence that Manufacturer Defendants sent a mailing to all their customers advising of the acquisition.  (<u>Id.</u>, Ex. A at 164.)  Manufacturer Defendants also

19

engaged in a marketing campaign to publicize the fact that "Sesco Products Group" was now part of Coe.  (Id., Ex. S at 43.)  Also, Sesco Products Group solicited Sesco customers for the business of servicing existing Sesco machines.  (Id., Ex. A at 88.)  Finally, Sesco Products Group benefitted from being able to use the well-known Sesco name.  Therefore, it appears from the evidence presented by Plaintiffs that Manufacturer Defendants did benefit from Sesco, Inc.'s good will through the relationships it gained with Sesco's former customers and through the association with Sesco and its products created by the acquisition.  We find that Plaintiffs have presented sufficient evidence to satisfy the third Ray factor for the purpose of summary judgment.

Accordingly, we hold that Plaintiffs have presented sufficient evidence on each of the Dawejko and Ray factors to raise a question of material fact as to whether the product line exception to successor non-liability applies in this case.

b.     Risk-Utility Analysis

We move now to an analysis of the substance of Plaintiffs' strict products liability claim. In order to determine whether Plaintiffs have presented sufficient evidence to survive summary judgment, we must first determine whether, as a matter of law, the machine in question is defective.  Fitzpatrick v. Madonna, 623 A.2d 322, 324 (Pa. Super. Ct. 1993) (citing Azzarello v. Black Bros. Co., 391 A.2d 1020, 1026 (Pa. 1978)).  Under the Restatement of Torts, a product is defective when it has "a defective condition unreasonably dangerous to the user or consumer." Restatement (Second) of Torts § 402A (1965).

To make the threshold determination of whether the product is defective, we must

conduct a risk-utility analysis in which we "balance the utility of the product against the

seriousness and likelihood of the injury and the availability of precautions that, though not

foolproof, might prevent the injury."  Fitzpatrick, 623 A.2d at 324.  Under Pennsylvania law as

interpreted by the United States Court of Appeals for the Third Circuit, courts utilize seven

factors to guide the risk-utility analysis:

> (1) The usefulness and desirability of the product – its utility to the
> user and to the public as a whole;
>
> (2) The safety aspects of the product – the likelihood that it will
> cause injury, and the probable seriousness of the injury;
>
> (3) The availability of a substitute product which would meet the
> same need and not be as unsafe;
>
> (4) The manufacturer's ability to eliminate the unsafe character of
> the product without impairing its usefulness or making it too
> expensive to maintain its utility;
>
> (5) The user's ability to avoid danger by the exercise of care in the
> use of the product;
>
> (6) The user's anticipated awareness of the dangers inherent in the
> product and their avoidability, because of general public
> knowledge of the obvious condition of the product, or of the
> existence of suitable warnings or instruction; and
>
> (7) The feasibility, on the part of the manufacturer, of spreading the
> loss [by] setting the price of the product or carrying liability
> insurance.

Surace v. Caterpillar, Inc., 111 F.3d 1039, 1046 (3d Cir. 1997) (citing Dambacher v. Mallis, 336,

485 A.2d 408, 423 n.5 (1984)).  These are called the "Wade" factors because they were

developed by Dean John Wade in his article On the Nature of Strict Tort Liability for Products,

44 Miss. L.J. 825, 837-38 (1973).

Under the first Wade factor, it is undisputed that the machine was useful, desirable, and

especially designed to meet the specific needs of the user.  Under the third Wade factor, Plaintiffs

have not presented any evidence that there was an alternate, safer product available to achieve the same purpose.  Therefore, we find that Wade factors one and three weigh in favor of not finding the machine defective.  However, for the reasons discussed below, we find that each of the remaining factors weighs in favor of finding the machine defective.

Under the second Wade factor, we consider the likelihood and gravity of the potential injury caused by the machine.  Plaintiffs presented evidence that the top pinch roll of the machine was completely unguarded.  In the human factors analysis conducted by Plaintiffs' expert, Dr. Stephen Wilcox, he found that "given that there was an unguarded in-running nip point, it was inevitable that workers would, at times, be injured . . . [especially] when the operator has a reason to be in the vicinity of the hazard."  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. V at 10.)  Given the large size and high power of the machine and the fact that there was no emergency off-switch near the nip point, the injury, when it occurred, would likely be grave.  In analyzing a case with similar circumstances the United States Court of Appeals for the Third Circuit found that:

> [g]iven . . . the fact that the profiler will from time to time cause injury and, if so, the injury will be serious given the immensity and huge weight of the machine, we do not believe that the court could properly hold, on account of disputed habituation evidence, that there was not a sufficiently grave risk of harm from the profiler to weigh in favor of [defendant] on the risk-utility analysis.

Surace, 111 F.3d at 1048.  We  find that the risk and potential gravity of the injury involved in this case weighs in favor of finding the product defective under the second Wade factor.

Under the fourth Wade factor we must weigh "the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to

maintain its utility." Surace, 111 F.3d at 1046.  Here, Plaintiffs argue that two of the main

aspects of the product that made it unsafe were the inadequate guarding of the rolls and the lack

of warnings and instructions related to the stock support and the cleaning of the rolls.  Plaintiffs

have presented evidence that the machine's manual contained no warnings regarding the

purported guarding function of the stock support nor any instructions on how to clean the

machine safely.  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. E.)  Such warnings and

instructions would not be costly and would help eliminate the unsafe character of the product by

making consumers aware of the need to keep the stock support in place and of the appropriate

safety precautions that they should take when cleaning the machine.   In addition, Plaintiffs

presented evidence that the stock support left the top roll exposed and that the machine was

operable when that stock support was removed.  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. U

at 5; Id., Ex. V at 10.)  According to Plaintiffs, the main safety measure that would have

eliminated the dangerous aspect of the machine would be the installation of interlocked top and

bottom guards.  (Id.)  These guards would have prevented workers from accidently coming too

close to either roll and being drawn into the pinch point between the two rolls.  Plaintiffs

presented evidence that these guards were available and feasible.  (Id.)  Defendants argue in their

motion that Plaintiffs "have admitted that they have never seen a straightener with . . . the alleged

alternative features."  (Manufacturer Defs.' Mot. 32.)  However, given that they argue that the

machine stock support was a guard for the bottom roll, it seems reasonable that the top roll could

have a similar guard.  Accordingly, we find that the manufacturer had the ability to install a top

guard and to provide adequate warnings and explanations as to the guarding feature of the stock

support.  The manufacturer also had the ability to provide instructions for safe cleaning of the

rolls.  Also, Manufacturer Defendants make no argument that these safety features would have been excessively expensive or that they would have diminished the machine's utility. Accordingly, we find that this factor weighs in favor of finding the machine defective.

Under the fifth Wade factor, we must consider not Van Doren's ability to avoid danger but rather "the objective user's ability to avoid danger by the exercise of care in the use of the [machine]."  Surace, 111 F.3d at 1052.  Manufacturer Defendants argue that this factor should weigh in their favor because Van Doren knew and understood the dangers presented by the machine and therefore could have anticipated and avoided the risk of getting his hand stuck in the machine.  (Manufacturer Defs.' Mot. 33.)  However, under governing precedent, "[t]he proper focus in applying the fifth Wade factor . . . is an objective inquiry into whether the class of ordinary purchasers of the product could avoid injury through the exercise of care in use of the product, not whether this particular plaintiff could have avoided this particular injury."  Surace, 111 F.3d at 1051.  Therefore, "[a]n individual plaintiff's failure to exercise care in the use of a product is not relevant to whether the product is unreasonably dangerous in the first place."  Id. In the present case, because the top roller was fully exposed, a person working with the machine would not have been able to completely avoid the possibility of coming into accidental contact with it.  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. V at 10.)  In addition, Manufacturer Defendants' predecessor did not include any instructions on how to clean the machine.  (Id., Ex. V at 9.) Therefore, any time the workers needed to clean the rolls, they would have had to come near the rollers to clean them.  (Id., Ex. U at 5.)  Finally, Van Doren testified that his arm became trapped while walking in front of the machine, which he had turned off prior to taking his break. (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. B, 48; Id. at 112-14.)  Given that the machine

operator's job involved standing in front of the roller area to put the metal into the rollers before beginning a job, the operator would not have been able to avoid being in front of the rollers in the course of his work when he thought the machine was off.  (Id., Ex. B at 47.)  Accordingly, we find that an objective user would not have been able to completely avoid the danger presented by the exposed rollers.

Under the sixth Wade factor, we analyze "the user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instruction."  Surace, 111 F.3d at 1046.  The focus in this inquiry is on the product, not on Van Doren's actual knowledge.  Id. at 1052.  Manufacturer Defendants allege that Plaintiffs' experts admitted that the danger was open and obvious.  (Manufacturer Defs.' Mot. 32.)  However, Dr. Wicolx testified that the danger was open and obvious to Van Doren, not necessarily to the general public.  (Id., Ex. H at 105.)  Also, nothing in the machine's manual indicated that the stock support was a safety feature or provided any warnings regarding its removal.  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. E.)  Therefore, due to the lack of suitable warnings or instruction regarding the function of the stock support, it would not be obvious to the general public that the machine was missing an original safety feature.  In other words, although it would be obvious that the rolls were not guarded, it would not be obvious they were supposed to be guarded or that a guard ever existed.  Plaintiffs' expert, Dr. Wilcox, testified that "in-going nip points formed between parts of rotating cylinders are particularly hazardous . . [because] [t]he hazard is not as immediately apparent as it is with machines that contain more obvious injury-causing parts, such as blades, grinding devices, or rams."  (Id., Ex. V at 6.)  Accordingly, we find that Plaintiffs have

presented sufficient evidence that a user would not be necessarily aware of the machine's dangerous conditions.[5]

Under the seventh Wade factor, we must weigh the manufacturer's ability to spread the risk of loss by adjusting the price of the product or carrying liability insurance. Manufacturer Defendants do not argue that the manufacturer lacked this ability. Rather, they argue that manufacturers should not be required to spread the economic loss of an accident that was caused "not by any defect in the product, but rather by an inattentive user." (Manufacturer Defs.' Mot. 33.) They further argue that it goes against public policy to hold manufacturers responsible for such a "bizarre" accident. (Id.) Under governing precedent, however, "an individual plaintiff's failure to exercise care in the use of a product is not relevant to whether the product is unreasonably dangerous." Surace, 111 F.3d at 1050. In fact, it is improper to "factor in the specific circumstances surrounding the cause of injury into th[e] threshold inquiry." Id. at 1053. We find that, as the party in the best position to determine the potential risks and costs, the manufacturer in this case had the ability to spread the risk of loss. Therefore, the seventh Wade factor weighs in favor of finding the product defective.

Accordingly, upon balancing the risk and utility of the machine as guided by the Wade factors discussed above, we find, as a matter of law, that the machine was unreasonably dangerous and defective.

---

[5]   However, we must note that, even if the conditions were obvious, "it is not necessarily sufficient to render a product duly safe that its dangers are obvious, especially if the dangerous condition could have been eliminated." Surace, 111 F.3d at 1052. Given that we have found that the condition could have been eliminated, the condition's obviousness would not render the product safe.

c.      Questions of Fact: Intended Use, Alteration, and Causation

Under Pennsylvania law, "[i]f the judge concludes that a product is 'unreasonably dangerous' the case is submitted to the jury, which then decides, based on all the evidence presented, 'whether the facts of the case support the averments of the complaint.'"  Moyer v. United Dominion Indus., 473 F.3d 532, 538 (3d Cir. 2007) (citing Azzarello, 391 A.2d at 1026). In so doing, the jury must determine whether when "the product 'left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use.'"  Id. at 539 (citing Phillips v. Cricket Lighters, 841 A.2d 1000, 1005 (Pa. 2003)).  To find a defendant liable based on strict liability, the jury must find: "(1) that the product was defective, (2) that the defect existed when it left the hands of defendant, and (3) that the defect caused the harm."  Ellis v. Chicago Bridge & Iron Co., 545 A.2d 906, 909 (Pa. Super. Ct. 1988).  To survive summary judgment, Plaintiffs must have presented sufficient evidence to raise genuine issues of material fact as to each element.  Fed. R. Civ. P. 56(c).  In the present case Manufacturer Defendants argue: (1) that there is no evidence that the machine was being used for its intended use; (2) that the machine was substantially altered by the purchaser; and (3) that Plaintiffs' evidence pertaining to causation is insufficient to survive summary judgment.  We address each argument in turn.

First, Manufacturer Defendants assert that there is no evidence that the machine was unsafe for its intended use because there is no explanation as to how the accident happened. Here, Van Doren testified that, on the day of the accident, he cleaned the machine, went out for a break, and was walking by the machine on his way back to work to start a new job on the machine when his hand became trapped in the machine.  (Pls.' Resp. to Manufacturer Defs.'

27

Mot., Ex. B, 48; Id. at 112-14.)  Cleaning the machine, starting a job on the machine, and walking in front of the machine in the course of preparing to operate it are all aspects of its intended use.  In analyzing whether the machine was safe for its intended use, "it is clear that 'unless the use giving rise to a strict liability cause of action is a reasonably obvious misuse . . . or unless the particular use . . . is clearly warned against, the manufacturer is not obviously exonerated.'"  Surace, 111 F.3d at 1054 (citing Metzgar v. Playskool, Inc., 30 F.3d 459, 465 (3d Cir. 1994)).  Here, there is no evidence that Van Doren's use of the machine was an obvious misuse.  Also the manufacturer provided no warnings about any of the ways in which Van Doren was using the machine.  Accordingly we find that Plaintiffs have presented sufficient evidence that the machine was unsafe for its intended use to raise a genuine question of material fact.

Second, Manufacturer Defendants argue that Plaintiffs have not presented sufficient evidence that the defect existed at the time the machine left the manufacturer's control because the machine was altered when the purchaser removed the stock support.  Under Pennsylvania law, "a manufacturer or seller is not liable for injuries caused by a defective product if the defect was created by an alteration which amounts to an intervening or superseding cause, as distinguished from a concurrent cause, of the injuries."  Eck v. Powermatic Houdaille, Div. of Houdaille Indus., Inc., 527 A.2d 1012, 1019 (Pa. Super. Ct. 1987).  However, "it is altogether possible that a plaintiff's injuries could be caused jointly by a defective product and also by third party negligence so long as the negligence does not constitute a supervening cause."  Rogers v. Johnson & Johnson Products, Inc., 523 Pa. 176, 185 (Pa. 1989).  Here, Plaintiffs have presented evidence that the lack of a top guard and the fact that the machine could operate when the stock support was removed were both factors that made the machine defective and caused Van Doren's

injury.  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. U at 5; Id., Ex. V at 10.)  Had the machine

been designed so that it could not operate if the stock support was removed, the machine would

obviously not have been operable after Columbia Spokane removed the stock support.

Accordingly, we find that Plaintiffs have presented sufficient evidence to raise a question of

material fact as to whether the removal of the stock support was a concurrent or a superseding

cause of the injuries.

Third, in arguing that Plaintiffs failed to show causation, Manufacturer Defendants assert

that the opinions of Plaintiffs' experts as to the cause of the accident are "premised upon

unsupported assertions" because they are unable to determine how Van Doren came in contact

with the machine.  (Manufacturer Defs.' Mot. 39.)  Under Pennsylvania law, causation is an issue

for the jury and a Court must not decide it as a matter of law unless "it is clear that reasonable

minds could not differ on the issue." Hamil v. Bashline, 392 A.2d 1280, 1284-5 (Pa. 1978).

Also, under Pennsylvania tort law "multiple substantial factors may cooperate to produce an

injury . . . and that concurrent causation will give rise to joint liability." Estate of Harsh v.

Petroll, 887 A.2d 209, 218 (Pa. 2005).  Here, Plaintiffs have presented evidence that one of the

aspects that made the machine defective is that the machine lacked a top guard, leaving the nip

point of the machine exposed.  (Pls.' Resp. to Manufacturer Defs.' Mot., Ex. U at 5; Id., Ex. V at

10.)  According to Plaintiffs' experts, another aspect that contributed to the defect is that the

machine was able to operate without guards.  (Id.)  Plaintiffs' experts have specifically found that

if the machine had top and bottom guards that prevented the machine from operating when

removed, Van Doren would not have been injured.  (Id.)  It is logical that if the machine had

guards that physically prevented a person's hand from coming near the nip point, in any way and

for any reason, when the rolls were in motion, Van Doren's hand would not have been able to reach the nip point.  Accordingly, we find that, contrary to Defendants' assertions, the experts' inferences are reasonable and sufficiently based on the evidence to raise genuine questions of material fact as to causation.

### 4.  Coe Press Equipment's Liability

Defendants assert that Coe Press Equipment cannot be held liable because it was Sesco Products Group,[6] not Coe Press Equipment, which originally purchased the assets of Sesco, Inc. (Manufacturer Defs.' Mot., Ex. L at 1.)  Sesco Products Group is a wholly owned subsidiary of Coe Press Equipment.  (Id., Ex. G at 25-26.)  Defendants argue that the Court should not "pierce the corporate veil" to find Coe Press Equipment liable.  (Manufacturer Defs.' Mot. 42-43.)  Piercing the corporate veil "was a doctrine originally designed by the courts to protect innocent parties by treating the corporation and its shareholders, or as in this case the parent and subsidiary, as identical for purposes of suit."  Kiehl v. Action Mfg. Co., 535 A.2d 571, 574 (Pa. 1987).  Under Pennsylvania law, "[t]here is a strong presumption against piercing the corporate veil . . . [and] [a]ny court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception."  Lumax Indus. v. Aultman, 669 A.2d 893, 895 (Pa. 1995) (citations omitted).  The factors that Pennsylvania courts consider in deciding whether to pierce the corporate veil include "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of

---

[6]     Sesco Acquisition Corp. was the original purchaser of Sesco, Inc.'s assets. (Manufacturer Defs.' Mot., Ex. L at 1.)  Following a series of name changes, Sesco Acquisition Group eventually became Sesco Products Group.  (Manufacturer Defs.' Mot., Ex. G at 26.) Sesco Products Group is a wholly owned subsidiary of Coe Press Equipment.  (Id., Ex. G at 25-26.)

corporate and personal affairs and use of the corporate form to perpetrate a fraud." Id. at 895.  In

the present case Plaintiffs have alleged no specific fats that would justify holding Coe Press

Equipment liable as an alter ego of Sesco Products Group.[7]  Accordingly, we will dismiss

Plaintiffs' claims as to Coe Press Equipment.


B.      Prior Owner Defendants

        We turn now to Prior Owner Defendants' Summary Judgment Motion.  Our discussion

will proceed in three parts.  Part 1 will address Prior Owner Defendants' argument that Hubbell

Lighting, Inc., and Hubbell Incorporated are immune from any action in tort by Plaintiffs based

on Pennsylvania's Workers' Compensation Act.  Part 2 will address Prior Owner Defendants'

contention that Plaintiffs have not presented sufficient evidence with regard to their negligence

claims.  Finally, Part 3 will address Plaintiffs' claims against Jacuzzi Brands, Inc.

1.      Workers' Compensation Exclusivity

        Prior Owner Defendants first argue that Hubbell Lighting, Inc., and Hubbell Incorporated

are immune from suit due to the fact that Pennsylvania's Workers' Compensation Act provides

the exclusive remedy for workers against their employers for injuries arising in the course of

---

[7]      Plaintiffs state in their response:

So long as Sesco Products Group has available to it the same assets to cover a judgment,
including insurance, then plaintiffs do not contest that Coe Press Equipment has
maintained an adequate separate corporate existence.

(Manufacturer Defs.' Mot. 45.)  Plaintiffs have presented no evidence regarding the assets
available to Sesco Products Group.  Accordingly, they have not presented sufficient evidence to
raise a genuine question of fact as to Coe Press Equipment's separate corporate existence.

employment.  (Prior Owner Defs.' Mot. 6-9.)  Defendants argue that Columbia Bristol and

Columbia Spokane were merged out of existence on January 1, 2005, approximately ten months

before Van Doren's injury.  (Id. at 6.)  They therefore assert that, at the time of the accident, Van

Doren was employed by Hubbell Lighting Inc., which is wholly owned by Hubbell Incorporated

as its sole shareholder.  (Id.)  Thus, they argue, Hubbell Lighting Inc. and Hubbell Incorporated

are immune from suit because they were Van Doren's employers at the time of the accident.  (Id.

at 6-9.)

The Pennsylvania Workers' Compensation Act states, in relevant part:

> The liability of an employer under this act shall be exclusive and in
> place of any and all other liability to such employee, his legal
> representative, husband or wife, parents, dependents, next of kin or
> anyone otherwise entitled to damages in any action at law or
> otherwise on account of any injury or death . . .

77 P.S. § 481(a) (1992).  This section makes the Workers' Compensation Act "the exclusive

remedy for an injured employee seeking redress from an employer for an on-the-job injury."

Peck v. Del. County Bd. of Prison Inspectors, 814 A.2d 185, 188 (Pa. 2002).  In the present case,

it is undisputed that the injury is an on-the-job injury as defined by the Act.  However, Plaintiffs

assert that the Act's exclusivity should not apply in this case for two reasons.  First, they assert

that Van Doren is entitled to sue his employer as a third party under the "dual persona" doctrine.

(Pls.' Resp. to Prior Owner Defs.' Mot. 6-9.)  Second, they argue that Hubbell Lighting, Inc., was

not Van Doren's employer because its mergers with Columbia Spokane and Columbia Bristol

were invalid.  (Id. at 14-18.)  We address each argument below.

     a.     The Dual Persona Doctrine

Plaintiffs initially note that the Workers' Compensation Act expressly permits an action for injury against a third party.  Section §481(b) of the Act states:

> In the event injury or death to an employee is caused by a third party, then such employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to receive damages by reason thereof, may bring their action at law against such third party . . .

77 P.S. § 481(b) (1992).  Based on this provision, Plaintiffs argue that they should be able to bring suit against Hubbell Lighting, Inc., not as Van Doren's employer but as the successor-in-interest to the alleged tortfeasor, namely Columbia Spokane.  The argument on which Plaintiffs rely is referred to as the "dual persona" doctrine, under which an employee is permitted to bring suit against their employer for injuries caused by a third party which has merged with the employer.  See, e.g., Thomier v. Rhone-Poulenc, Inc., 828 F. Supp. 548 (W.D. Pa. 1996).  Under this doctrine, "[a]n employer may become a third person, vulnerable to tort suit by an employee, if--and only if--it possesses a second persona so completely independent from and unrelated to its status as employer that by established standards the law recognizes that persona as a separate legal person."  6-113 Larson's Workers' Compensation Law § 113.01[4].  For the doctrine to apply, the duties owned by the employer under its separate persona must be "totally separate from and unrelated to those of the employment."  Id.  Courts that apply this doctrine in the merger context usually base its application on the theory that employer immunity should not insulate an employer "from obligations it inherited through corporate merger simply because of the immunity for its own negligence it possessed as the employer of the insured employee."  Gurry v. Cumberland Farms, Inc., 550 N.E.2d 127, 131(Mass. 1990).

Pennsylvania courts have yet to apply the dual persona doctrine.  However, Plaintiffs rely

on Thomier v. Rhone-Poulenc, Inc., where the United States District Court for the Western District of Pennsylvania, sitting in diversity, predicted that the Pennsylvania Supreme Court would likely apply the dual persona doctrine in the merger context and held that the doctrine permitted the plaintiff's suit in the case before them.  (Pls.' Resp. to Prior Owner Defs.' Mot. 6-14.)  Plaintiffs now call upon this Court to concur with that prediction and apply the dual persona doctrine to the present facts.

As a federal court sitting in diversity, we must apply the relevant state's substantive law. Jaworowski v. Ciasulli, 490 F.3d 331, 333 (3d Cir. 2007) (citing Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938)).  In this case, both parties agree that Pennsylvania law applies to the issue of workers' compensation exclusivity.  However, because the Pennsylvania Supreme Court has not spoken on the dual persona doctrine, we must predict how that tribunal would rule.  U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co., 80 F.3d 90, 93 (3d Cir. 1996).  In formulating that prediction we may look to "lower state court decisions . . .the policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies . . . the decisions of other courts . . . treatises . . . and the works of scholarly commentators."  Hamme v. Dreis & Krump Mfg. Co., 716 F.2d 152, 155 (3d Cir. 1982) (citing Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co., 652 F.2d 1165, 1167 (3d Cir. 1982)).  Below, we examine relevant decisions of Pennsylvania courts, the decisions of courts in other jurisdictions, and a leading treatise on workers' compensation.

I.      Pennsylvania State Courts

In response to Plaintiffs' dual persona argument, Prior Owner Defendants assert that:

Pennsylvania courts would likely reject "dual persona" or severely

34

> limit its applicability as it has done with "dual capacity" finding that
> workers' compensation is the employee's exclusive remedy against
> the employer when the employee is injured within the course and
> scope of his employment.

(Prior Owner Defs.' Mot. 3.)  Indeed, the Pennsylvania Superior Court has taken an unfavorable view of the dual capacity doctrine.  See Heimbach v. Heimbach, 584 A.2d 1008 (Pa. Super. Ct. 1991); Callender v. Goodyear Tire & Rubber Co., 564 A.2d 180, (Pa. Super. Ct. 1989). However, most courts that have adopted the dual persona doctrine in the merger context, including the Court of Appeals of New York and New Jersey Superior Court, have also expressly rejected the dual capacity doctrine and have emphasized the otherwise exclusive nature of the workers' compensation remedy.[8]   Like those courts, the Pennsylvania Superior Court has recognized that the dual persona doctrine is narrower and more conservative than the dual capacity doctrine.  As explained by the Pennsylvania Superior Court in Callender v. Goodyear Tire & Rubber Co., under the dual capacity doctrine, the focus is simply on whether the employer was acting in another capacity.  564 A.2d at 185 (citing 2A Larson, Workmen's Compensation Law, § 72.8 (1988)).  Under the dual persona doctrine, on the other hand, the employer must

---

[8]      In Billy v. Consolidated Machine Tool Corp., the Court of Appeals of New York stated that New York's compensation statute "provides that the employer's obligation to furnish workers' compensation benefits is exclusive and in place of any other liability whatsoever to employees or their dependents for injuries sustained in the course of employment."  412 N.E.2d 934, 937 (N.Y. 1980).  The Billy court also expressly rejected the dual capacity exception.  Id. at 938.

In Petrocco v. AT&T Teletype, Inc., the New Jersey Superior Court also highlighted that "an employee's only remedy against his employer for a work related accident is workers' compensation; tort suits, such as this, are therefore barred against the employer."  642 A.2d 1072, 1073 (N.J. Super. Ct. Law. Div. 1994).  The Petrocco court also noted that "[t]he dual capacity doctrine has not found favor in [New Jersey]" but emphasized that the doctrine it was applying differed from the dual capacity doctrine in that the Petrocco court was "dealing not with the dual capacity of one corporation but with the merger of formerly separate corporations, each of which acted in a different capacity."  Id. at 1074.

have a persona so separate from his status as employer that the law recognizes it as a "separate legal person." Id. The Callender court also cited favorably other jurisdictions that have abandoned the dual capacity doctrine in favor of the dual persona doctrine. Id. at 187-88. In addition, although decisions by the Pennsylvania Superior Court have rejected the broader dual capacity doctrine, that court has not done so even when faced with the opportunity. In Tatrai v. Presbyterian University Hospital, a hospital employee was permitted to bring a tort action against her employer for injuries she suffered while being treated in the employer's emergency room after she became ill while at work. 439 A.2d 1162 (Pa. 1991). The Pennsylvania Supreme Court has not overruled Tatari. Instead, in its most recent decision on dual capacity, it distinguished the facts from Tatari in finding that dual capacity did not apply. In Snyder v. Pocono Medical Center, a hospital employee sought to bring an action against her employer based on its dual capacity as a medical provider. 690 A.2d 1152 (Pa. 1997). The plaintiff had been treated by the hospital under a tuberculosis protocol applicable to employees only. In barring the plaintiff's suit, the Court did not reject the dual capacity doctrine. Rather, it distinguished the facts from Tartari because in Tartari the emergency room that treated the employee was available to the general public whereas in Snyder the protocol under which plaintiff was treated was available only to employees. Id. at 1154-55. The Court held that "[t]he hospital was therefore not acting in a dual capacity as an employer and medical provider." Id. at 1154. The Court's treatment of Tartari in Snyder suggests that it is still good precedent. The Court's language in Snyder also implied that it may still be willing to apply dual capacity in circumstances where the employer was truly acting in a completely separate dual capacity. This apparent willingness to entertain the broader dual capacity doctrine suggests that the Pennsylvania Supreme Court would be willing to

apply the narrower, more conservative dual persona doctrine in the present case where the employer had an entirely different legal persona completely unrelated to employment as a successor in interest to Columbia Spokane.

Accordingly, we find that Pennsylvania case law signals that the Pennsylvania Supreme Court would apply the dual persona doctrine in this case.

II.      Other Jurisdictions

Our review of cases around the country that address the workers' compensation exclusivity in the merger context reveal that the vast majority of courts have allowed the plaintiff's suit to proceed under the dual persona doctrine.  See Billy v. Consolidated Machine Tool Corp., 412 N.E.2d 934 (N.Y. 1980); Schweiner v. Hartford Accident & Indem. Co., 354 N.W.2d 767 (Ct. App. 1984); Kimzey v. Interpace Corp., 694 P.2d 907 (Kan. Ct. App.1985); Robinson v. KFC Nat'l Management Co., 525 N.E.2d 1028 (Ill. App. Ct. 1st Dist. 1988); Gurry v. Cumberland Farms, Inc., 550 N.E.2d 127 (1990); Thomas v. Valmac Indus., Inc., 812 S.W.2d 673 (1991); Oliver v. N.L. Indus., Inc., 170 A.D.2d 959 (N.Y. 1991); Percy v. Falcon Fabricators, Inc., 584 So. 2d 17 (Fla. Dist. Ct. App. 3d Dist. 1991); Petrocco v. AT & T Teletype, Inc., 642 A.2d 1072 (N.J. Super. Ct. Law. Div. 1994); Kern v. Frye Copysystems, Inc., 878 F. Supp 660 (S.D.N.Y. 1995); Herbolsheimer v. SMS Holding Co., 608 N.W.2d 487 (Mich. Ct. App. 2000); Peterson v. Indus. Door Co., 2008 Minn. App. Unpub. LEXIS 46 (Minn. Ct. App. 2008).  These cases invariably involve a plaintiff seeking to bring a tort action against his employer as successor in interest to a third-party tortfeasor that merged with his employer.  In each of these cases the plaintiff's injury was caused by a product conveyed or produced by the third-party prior to the merger.  The courts that have applied the dual persona doctrine in this context generally

37

base their rationale on the fact that plaintiff's ability to sue the third-party company in tort is not precluded by workers' compensation exclusivity and should therefore not be extinguished by the merger.  See, e.g., Gurry, 550 N.E.2d at 131.

Our analysis also reveals that each of the above-mentioned cases falls within a very narrow factual pattern that mirrors the facts before us.  Only a small minority of jurisdictions that have been faced with this narrow factual context have decided not to apply the dual persona doctrine.  See Quick v. All Tel Missouri, Inc., 694 S.W.2d 757 (Mo. Ct. App. 1985); Davis v. Sinclair Ref. Co., 704 S.W.2d 413 (Tex. Ct. App. 1985);  Hatch v. Lido Co., 609 A.2d 1155 (Me. 1992).  However, these cases employed rationales that would likely not be adopted by the Pennsylvania Supreme Court.[9]  The rest of the decisions that have failed to apply the dual

---

[9]	In Quick v. All Tel Missouri, Inc., 694 S.W.2d 757 (Mo. Ct. App. 1985), the court rejected the plaintiff's dual persona argument because the alleged cause of action against the predecessor corporation had not accrued at the time of the merger with the successor corporation. We find that Pennsylvania courts would not adopt this rationale because, under Pennsylvania's successor liability doctrine, successors are responsible for injuries caused by products produced by their predecessor before the merger even if the injury occurs after the merger.  See Putt v. Yates-American Mach. Co., 722 A.2d 217, 225 (Pa. Super. Ct. 1998).  Pennsylvania therefore recognizes that a successor absorbs the predecessors inchoate liabilities.
	In Davis v. Sinclair Ref. Co., 704 S.W.2d 413 (Tex. Ct. App. 1985), the court also rejected the plaintiff's dual persona argument.  However, that court emphasized the voluntary nature of Texas's workers' compensation remedy and based its decision partly on the fact that employees "voluntarily agreed that the rights and remedies otherwise existing under the common law shall not be operative."  Id. at 415.  By contrast, Pennsylvania's workers' compensation system is not voluntary.  Pennsylvania's workers' compensation statute "makes the workers' compensation system the exclusive remedy for an injured employee seeking redress from an employer for an on-the-job injury."  Peck, 814 A.2d at 188 (Pa. 2002).
	In Hatch v. Lido Co., 609 A.2d 1155 (Me. 1992), the court did not apply the dual persona doctrine because the duty that the plaintiff alleged the predecessor had violated was an "identical duty owed to him by . . . his employer -- the failure of an employer to provide a safe workplace." Id. at 1157 (Me. 1992).  The predecessor in that case had allegedly failed to maintain the basement of the gas station it owned.  Therefore, the only duty it could have violated would have been the duty to protect employees.  Here, by contrast, Plaintiffs allege that Columbia Spokane was negligent in transferring a defective machine to Plaintiffs' former employer without

persona doctrine in the merger context involve materially different facts from those before us.

For example, courts consistently find the dual persona doctrine inapplicable in cases where the

plaintiff would not have been able to bring suit against the predecessor company even if a merger

had never occurred.[10]  The approach of these courts can be summarized as follows: if the plaintiff

could not have sued the predecessor in tort if the merger had not occurred, they cannot sue the

predecessor in tort.  This rationale is based on the idea that the dual persona doctrine should not

be applied to allow "a merger to increase, rather than preserve, inchoate liability."  Braga, 420

F.3d at 44-5.  Those cases are clearly distinguishable from the present case because, had

Columbia Spokane never merged with Van Doren's employer, Van Doren could have brought

suit against Columbia Spokane based on negligent transfer of a dangerous product under Section

388 of the Restatement (Second) of Torts.  Therefore, in the present case, the application of the

dual persona doctrine would preserve rather than extend Van Doren's claims against Colombia

Spokane.

> We also find relevant the fact that the cases that have encountered facts most similar to

---

providing adequate warnings.  That duty is separate and independent from any duty owed to Van
Doren by his employer.

[10]     These situations arise in cases where the predecessor corporation was the original
employer of the plaintiff.  See Minton v. Ralston Purina Co., 146 Wn.2d 385, 394 (Wash. 2002).
They also arise where the product in question was used exclusively by the predecessor
corporation's employees and was never transferred before the merger.  In these situations courts
have found that a plaintiff could not have brought a separate claim against the predecessor
because, had the merger not occurred, only employees of the predecessor could have been injured
by the machine and they would be barred from suing their employer.  See Braga v. Genlyte
Group, Inc., 420 F.3d 35 (1st Cir. Mass. 2005); Corr v. Willamette Indus., Inc., 713 P.2d 92
(1986); Herbolsheimer v. SMS Holding Co., 608 N.W.2d 487 (Mich. Ct. App. 2000); Griffin,
Inc. v. Loomis, Fargo & Co., 979 So. 2d 416 (Fla. Dist. Ct. App. 2d Dist. 2008).  Finally, they
arise where the court finds that the predecessor was not the tortfeasor.  See Vega v. Standard
Mach. Co., 675 A.2d 1194 (App. Div. 1996).

those before us have applied the dual persona doctrine.  For example, in several of these cases, like in the present case, the plaintiff's injury occurred after the predecessor company and plaintiff's employer merged, but the injury was caused by a product manufactured or conveyed by the predecessor company prior to the merger.[11]  These courts have found that the plaintiff's employer is responsible for the liabilities of the predecessor company even if those liabilities were inchoate until after the merger.  The following are examples of such decisions.

In Billy, the New York Court of Appeals allowed the plaintiff to bring a suit against her deceased husband's employer, USM Corporation, based on the USM's status as successor in interest to the two companies who had manufactured and installed the allegedly defective machine that killed her husband in the course of his employment.  Billy, 412 N.E.2d at 937-40. The machine that caused the injury was manufactured by the alleged tortfeasors in the early 1950's and was installed by one of them in 1955.  Id. at 937.  By 1968 both alleged tortfeasors

---

[11]      Prior Owner Defendants argue that cases where the predecessor corporation was the manufacturer of the product are distinguishable because here Colombia Spokane did not manufacture the product, it simply transferred it to Colombia Bristol.  We do not agree that this difference makes such cases distinguishable.  The question that courts focus on in deciding whether to apply the dual persona doctrine is whether the plaintiff could have brought suit against the predecessor if there had never been a merger with the plaintiff's employer.  See, e.g., Billy, 412 N.E.2d 940.  Here, Plaintiffs' claim against Colombia Spokane rests on its alleged negligent transfer of a dangerous machine to Colombia Bristol.  Under the Restatement (Second) of Torts § 388 a party can be liable for negligently supplying a dangerous product to another and failing to inform the receiver of the potential danger.  Pennsylvania courts have adopted Section 388.  See Binder v. Jones & Laughlin Steel Corp., 520 A.2d 863, 866 (Pa. Super. Ct. 1987). Under Comment c to Section 388, these rules apply not only to manufacturers but also to "sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person."  Accordingly, Plaintiffs could have brought a claim against Colombia Spokane as a donor of the machine under Section 388.  Therefore, under the rationale employed by courts around the country that apply the dual persona doctrine in the merger context, the doctrine would apply in this case because Plaintiffs could have brought an action against Colombia Spokane if the merger had never occurred.

40

had merged into USM.  Id. at 937.  The plaintiff's injury occurred in 1976.  Id.  USM argued that

it was immune from suit based on the exclusivity of the Workers' Compensation remedy.  The

Billy court found that:

> Conceptually, the deceased employee's executrix is suing not the
> decedent's former employer, but rather the successor to the liabilities
> of the two alleged tort-feasors. . . [The] obligation upon which [USM]
> is being sued arose not out of the employment relation, but rather out
> of an independent business transaction between USM and [the alleged
> tortfeasors].  What distinguishes this case from the "dual-capacity"
> cases discussed above is that here the tort in question was not
> committed by the employer or any of its agents; instead, the tort, if
> any, was committed by third parties, which, . . . never had an
> employer-employee relationship with the injured party.  Since these
> third parties would have had no basis for invoking . . . the Workers'
> Compensation Law as a defense in a common-law action brought
> against them by the employee or his dependents, USM, which stands
> in their shoes with respect to the question of liability, should similarly
> not be permitted to do so.

412 N.E.2d at 940.  The court also held that, since USM had voluntarily assumed the obligations

of the corporations with which it merged, including liabilities arising from accidents caused by

their products, "[i]t would be grossly inequitable to permit USM to avoid its assumed obligations

solely because the injured party was coincidentally an employee and the injuries in question arose

in the course of his employment."  Id.  The Billy court therefore allowed the action to proceed as

an action against a non-employer third-party brought through a suit against its corporate

successor.  Id.

    Similarly, in Gurry, the plaintiff's decedent was killed by a "sand buggy" in the course of

his employment.  550 N.E.2d at 129.  In 1983, the decedent's employer contracted with an

outside corporation for the manufacture of the sand buggy.  Id.  In 1984, the decedent's employer

merged with the manufacturer of the sand buggy.  Id.  The accident that caused the employee's

death occurred in 1985.  Id.  Plaintiffs brought suit against the decedent's employer and the employer claimed immunity from suit under the Massachusetts workers' compensation statute. Id. at 130.  The Supreme Court of Massachusetts applied the dual persona immunity and held that the employer was not immune from suit because its liability, if any, arose "solely from the negligence of an independent corporation no longer in existence which has been acquired by [the employer] for its own purposes."  Id. at 131.  The court found that to hold the employer immune from a liability it acquired through merger simply because it happened to employ the plaintiff would go against the aims of the workers' compensation system and the business corporation statute.  Id.

In Petrocco, a plaintiff brought an action against his employer for injuries resulting from the use of a defective keyboard in the course of employment.  The manufacturer of the keyboard and the plaintiff's employer merged in 1989.  Petrocco, 642 A.2d at 1073.  The keyboard was manufactured prior to the merger, but the plaintiff's injuries occurred after the merger between 1990 and 1991.  Id.  The New Jersey Superior Court found that the Workers' Compensation Act was not intended to immunize a third-party against suit simply because they entered into a business transaction with the injured party's employer.  Id. at 1074.  Therefore, the court held that, under the dual persona doctrine, the plaintiff was entitled to bring suit against his employer as successor in interest to the manufacturer.  Id.

Like the Billy, Gurry, and Petrocco courts, Pennsylvania courts have also found that a successor to a corporation inherits liabilities arising from injuries produced by its predecessor's products even if the injuries do not occur until after the merger.  See Putt v. Yates-American Mach. Co., 722 A.2d 217, 225 (Pa. Super. Ct. 1998).  In addition, pursuant to Pennsylvania's

Workers' Compensation Act, injured employees have the right to bring suit against third parties for injuries incurred in the course of their employment.  Heckendorn v. Consolidated Rail Corp., 465 A.2d 609, 610 (Pa. 1983).  We predict that, building on these foundations, the Pennsylvania Supreme Court, like the majority of its sister courts, would allow a plaintiff to sue the successor to a third-party tortfeasor even if that successor happened to be the plaintiff's employer.

        iii.    Treatise

Pennsylvania courts have consistently cited Professor Arthur Larson's treatise The Law of Workman's Compensation in workers' compensation cases.  See, e.g., McIlvaine Trucking v. Workers' Comp. Appeal Bd., 810 A.2d 1280, 1286 n.10 (Pa. 2002).  Most of the cases that address the dual persona doctrine cite Professor Larson's treatise for the definition and explanation of the doctrine.  See, e.g., Herbolsheimer, 608 N.W.2d at 491-92.  In that treatise, Professor Larson has extensively analyzed the dual persona doctrine.  See 6-113 Larson's Workers' Compensation Law § 113.01 (2008).  In so doing, he has cited favorably courts that apply the dual persona doctrine in the merger context.  For example, in his discussion of the Billy case, he stated:

> The court of appeals has thus performed a signal service in disavowing the distorted dual-capacity doctrine while, at the same time, demonstrating that a genuine case of separate legal personality can be satisfactorily dealt with under the dual persona doctrine.

Id. at § 113.01[3] (2008).  We find it relevant that the primary commentator on dual capacity and dual persona has found Billy to be a correct application of the dual persona doctrine.

        iv.    Conclusion

For the reasons stated above, we find that the decisions of Pennsylvania courts, the

decisions of the majority of other jurisdictions, and the analysis of one of the leading treatises on workers' compensation all signal that the Pennsylvania Supreme Court would likely apply the dual persona doctrine in the present case. Accordingly, we will not grant summary judgment on Plaintiffs' claims against Hubbell Lighting, Inc., and Hubbell Incorporated.

      b.    <u>Plaintiffs' Challenge to the Mergers</u>

In denying Hubbell Lighting, Inc.'s immunity based on workers' compensation exclusivity, Plaintiffs also argue that Hubbell Lighting, Inc. was never Van Doren's employer because its mergers with Columbia Bristol and Columbia Spokane were invalid. At the outset we point out that both parties analyze Plaintiffs' merger challenge and that Plaintiffs do not dispute Prior Owner Defendants' assertion that Daware law governs the challenged mergers. Accordingly, we apply Delaware law as to this issue.

In analyzing whether parties have standing to challenge a merger, Delaware courts have followed the United States Supreme Court's guidance provided in <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992), where the Court explained the elements that a party must show to assert standing. <u>See</u> <u>In re Transkaryotic Therapies, Inc.</u>, 954 A.2d 346, 362 (Del. Ch. 2008). The <u>Lujan</u> Court described the elements as follows:

> First, the plaintiff must have suffered an "injury in fact," an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

504 U.S. at 560.

The main problem with Plaintiffs' challenge to the mergers is that they do not assert that they suffered any injury arising from the "conduct complained of," namely, the alleged failure to comply with statutory formalities in the effectuation of the merger.  Plaintiffs' expert opines that the merger was defective due to "defective and improper" filings.  (Pls.' Resp. to Prior Owner Defs.' Mot., Ex. W at 5.)  Plaintiffs have failed to present any possible causal connection between the alleged defects in the merger and any injury that they have suffered.  Accordingly, we find that Plaintiffs lack standing to challenge or void the merger.

2.    Negligence

Under Pennsylvania law, "[n]egligence is a question for the jury . . . [and] [t]he court should not remove the question from the jury unless the facts leave no room for doubt." Dougherty v. Boyertown Times, 547 A.2d 778, 787 (1988).  Accordingly, at the summary judgment stage, we examine whether Plaintiffs have presented sufficient evidence to raise a question of material fact as to whether Columbia Spokane was negligent in the transfer of the machine.  As discussed above, Plaintiffs' negligence claim rests on Restatement (Second) of Torts § 388, which states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous
condition or of the facts which make it likely to be dangerous.

Prior Owner Defendants argue that summary judgment should be granted on Plaintiffs'

negligence claims because: (1) there is no evidence that Columbia Bristol or Van Doren were

unaware of the open and obvious danger created by the machine's nip point; (2) there is no duty

to convey safety items and features; (3) there is no legal basis for applying Section 388 to two

entities of the same corporation; (4) there is no evidence that the machine was defective as

transferred; (5) there is no evidence that Columbia Spokane failed to transfer warnings or

instructions; (6) Plaintiffs have not presented sufficient evidence of causation.  We address each

argument in turn.

        Prior Owner Defendants assert that there is no evidence that Columbia Bristol or Van

Doren was unaware of the danger created by the nip point of the rollers.  They argue that, under

Comments f and k to Section 388, they have no duty to warn of dangerous characteristics that are

obvious or known to the recipient. (Prior Owner Defs.' Mot. 16.)  They further argue that the fact

that the stock support was missing was obvious to Columbia Bristol because they were operating

other similar straighteners.  (Id.)  However, Prior Owner Defendants point to no evidence on the

record to support their assertions about Columbia Bristol's knowledge.  Therefore, as the moving

party on this summary judgment motion, Prior Owner Defendants have not met their initial

burden "of identifying those portions of the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, which [they] believe[] demonstrate the

absence of a genuine issue of material fact." El v. SEPTA, 479 F.3d 232, 237 (3d Cir. 2007).

Moreover, Plaintiffs presented evidence that, when Columbia Spokane had the machine under its

46

control, it had added a feeding tray to create a "safe way to load the equipment." (Pls.' Resp. to Prior Owner Defs.' Mot., Ex. L at 59.) The tray provided safety because it prevented workers from having to come close to the loading area of the machine. (Id.) Prior Owner Defendants make no argument that the need for the tray and the lack of a tray at the time of conveyance were obvious to Columbia Bristol. By contrast, Plaintiffs presented evidence that raises a question as to whether Columbia Spokane provided Columbia Bristol with any safety information at all regarding the machine at the time of conveyance. The mechanic that installed the machine, Michael Misavage ("Misavage"), testified that all they received was "an electronic instruction manual inside the control panel." (Pls.' Resp. to Prior Owner Defs.' Mot., Ex. M at 41-42.) Misavage further testified that no outside entity helped with the installation and that they just "figure[d] out how it worked" and "hooked it up the way it came in." (Id.) Also, when asked whether he had received any service manual, the manual that usually contains the safety information for the machine, the worker reasoned "I don't think so, because it was a used piece of equipment coming to us." (Id. at 67.) Accordingly, we cannot conclusively find at this stage that the danger of the machine being improperly guarded at the time of transfer was obvious to Columbia Bristol.

In arguing that the danger was obvious to Van Doren, Prior Owner Defendants assert that he testified that he was aware that the nip point was dangerous and that the rollers could "crush your bones." (Pls.' Resp. to Prior Owner Defs.' Mot., Ex. G at 82.) However, the danger in question here is not just the nip point, but rather the unguarded nature of the machine. As explained above, Plaintiffs presented evidence that the machine was not conveyed with any instructions indicating that the stock support had been removed or that the feeding tray that

47

permitted safe loading of materials into the machine was missing.  (Pls.' Resp. to Prior Owner

Defs.' Mot., Ex. M at 41-42, 67.)  Van Doren also testified that the only safety instructions that

he remembers receiving were to "keep [his] hands out of everything."  (Prior Owner Defs.' Mot.,

Ex. N at 73.)  Defendants have pointed to no evidence on the record that Van Doren was aware

that the machine was improperly guarded or that it was missing the stock support and the feeding

tray.  Accordingly, we find that there remains a question of material fact as to whether Van

Doren was aware of the special danger presented by the lack of guarding on the machine.

Prior Owner Defendants' next argument is that there is no evidence that the product was

defective in the condition in which they transferred it to Columbia Bristol.  (Prior Owner Defs.'

Mot. 17-18.)  The question under Section 388 is not whether the machine was defective, but

rather whether the machine was "likely to be dangerous for the use for which it is supplied."

Restatement (Second) of Torts § 388(a).  Plaintiffs' experts testified that Columbia Spokane's

removal of the stock support made the machine even more dangerous.  (Pls.' Resp. to Prior

Owner Defs.' Mot., Ex. U at 4; Id., Ex. V at 11.)  In addition, Plaintiffs presented evidence that

Columbia Spokane developed a loading tray as a safety measure to keep workers away from the

machine.  Keith Cauvel, one of Columbia Spokane's employees testified that he thought

Columbia Spokane attached the loading tray to the machine.  (Id., Ex. L at 59.)  He stated that

they did so because they "were looking for a safe way to load the equipment . . . [n]ot involved

by the operator basically."  (Id.)  He further testified that the trays were necessary because

without them "you have to get in between the straighter and the reel" to load the machine.  (Id.,

Ex. L at 59-60.)  This testimony signals that Columbia Spokane realized that, without the loading

tray that it added to the machine, the machine was dangerous.  Therefore, since they did not

convey the tray nor any instructions on how to make the machine safe, there remains a question of material fact as to whether they had reason to know the machine was likely to be dangerous.

Prior Owner Defendants also argue that they had no duty to convey safety items and features.  However, what Plaintiffs allege is not that Prior Owner Defendants had a duty to do so, but rather that they had a duty to "inform them of its dangerous condition or of the facts which make it likely to be dangerous."  Restatement (Second) of Torts § 388(c).  As we discussed above, Plaintiffs presented evidence that no such information was conveyed.  (Pls.' Resp. to Prior Owner Defs.' Mot, Ex. M at 41-42, 67.)  Accordingly, a genuine question of material fact remains as to this issue.

Prior Owner Defendants allege that there is no legal basis for applying Section 388 to two entities of the same corporation.  However, Prior Owner Defendants' own expert, Professor Edward Rock, stated in his report that, prior to 2005, Columbia Spokane and Columbia Bristol were separate wholly owned subsidiaries of Prescolite.  (Prior Owner Defs.' Mot., Ex. K at 2.)  In fact, he refers to them by their different corporate names.  He refers to Columbia Bristol as "Columbia Lighting -LCA, Inc. (Columbia Bristol)" and to Columbia Spokane as "Columbia Lighting Inc. (Columbia Spokane)".  (Id.)  According to Professor Rock, it was not until January 1, 2005, that Columbia Spokane and Columbia Bristol merged into Prescolite.  (Id. at 4.)  He describes the merger of Columbia Bristol into Prescolite and the merger of Columbia Spokane into Prescolite as two separate mergers.  (Id.)  Had Columbia Bristol and Columbia Spokane been separate legal entities, there would have been no need to conduct separate mergers for each entity.  Pennsylvania courts have consistently treated subsidiaries and their parent companies as separate corporations.  See Botwinick v. Credit Exchange, Inc., 213 A.2d 349, 353-54 (Pa.

49

1965); Pushnik v. Winky's Drive in Restaurants, Inc., 363 A.2d 1291, 1296 (Pa. Super. Ct. 1976).  Accordingly, we disagree with Prior Owner Defendants' contention that Columbia Bristol and Columbia Spokane were "two entities of the same corporation."  We find that there is sufficient evidence in the record to support the assertion that Columbia Bristol and Columbia Spokane were separate legal entities at the time of the machine transfer.  Furthermore, Comment c to Section 388 of the Restatement (Second) of Torts makes clear that the Section applies to "sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person."  It is clear that this language applies to Columbia Spokane as the donor of the machine to Columbia Bristol.  Accordingly, we reject Prior Owner Defendants' argument that Section 388 cannot be applied to Columbia Spokane.

Prior Owner Defendants next argue that there is no evidence that Columbia Spokane failed to transfer warnings or instructions.  As explained above, Plaintiffs have presented sufficient evidence that Columbia Spokane conveyed no warnings or instructions other than an electronic user manual.  (Pls.' Resp. to Prior Owner Defs.' Mot, Ex. M at 41-42, 67.)  We find that there remains a question of material fact as to whether Columbia Spokane failed to transfer warnings or instructions.

Finally, Prior Owner Defendants assert that Plaintiffs have not presented sufficient evidence of causation.  In Pennsylvania, causation is a question of fact for the jury.  Hamil v. Bashline, 392 A.2d 1280, 1284-5 (Pa. 1978).  The question can only be removed from the jury's consideration "where it is clear that reasonable minds could not differ on the issue."  Id. Therefore, Plaintiffs need only present sufficient evidence to raise a question of material fact as to this issue.  Plaintiffs' expert, Craig Clause, stated in his report that the accident "also occurred

because Columbia Spokane rendered the machine even more defective and hazardous when it made alterations to the straightener before delivering the machine to Mr. Van Doren's employer." (Pls.' Resp. to Prior Owner Defs.' Mot., Ex. U at 4.)  Plaintiffs' second expert, Dr. Wilcox, also stated in his report that "Columbia Spokane . . . actually altered the machine to make it even more defective than it had been when it bought it."  (Id., Ex. V at 11.)  Also, Manufacturer Defendant's expert, Dr. Clyde Richards, asserted in his report that "[t]he removal of the stock support played a role in this accident."  (Id., Ex. AA at 25.)  We find that Plaintiffs have presented sufficient evidence to raise a question of material fact as to causation.

For the reasons stated above, we find that Plaintiffs have presented sufficient evidence to raise questions of material fact as to each element of their claim under Section 388.  Accordingly, we cannot grant summary judgment on Plaintiffs' negligence claim.

D.      Liability of Jacuzzi Brands, Inc.

Prior Owner Defendants also move for summary judgment in favor of Jacuzzi Brands, Inc. ("Jacuzzi").  They assert that Plaintiffs have no evidence against Jacuzzi and that there is no viable cause of action against it.  (Prior Owner Defs.' Mot. 20-21.)  Plaintiffs respond that, if Larry Schmidt, who was involved in the transfer of the machine from Columbia Spokane to Columbia Bristol, was an employee or officer of Jacuzzi Brands at the time of the transfer, then Jacuzzi Brands may have liability.  (Pls.' Resp. to Prior Owner Defs.' Mot. 24 n.13.)  They further assert that, "if defendants provide proof, by affidavit or otherwise, that Mr. Schmidt was not an employee or officer of Jacuzzi at the time, then plaintiffs do not oppose summary judgment to Jacuzzi."  (Id.)

Plaintiffs' response to Prior Owner Defendants' argument is inconsistent with the standard for summary judgment.  At the summary judgment stage, the defendant bears the initial burden of pointing to the portions of the pleadings and the records "which it believes demonstrate the absence of a genuine issue of material fact."  SEPTA, 479 F.3d at 237.  Once the defendant has done so, the burden shifts to Plaintiff to point to evidence in the record that shows that a genuine issue of material fact remains.  Id. at 238.  Here, Prior Owner Defendants have pointed to the fact that the record does not include any evidence against Jacuzzi.  Plaintiffs' burden therefore is to point to evidence on the record that raises a genuine issue of material fact as to Jacuzzi.  Plaintiffs have not met this burden.  They do not dispute that the record does not include evidence against Jacuzzi.  Plaintiffs point to no evidence that supports their contention that Mr. Schmidt may have been an employee or officer of Jacuzzi at the time of the transfer. Therefore, we find that the record presents no genuine issue of material fact as to Jacuzzi's liability.  Accordingly, we will grant summary judgment in favor of Jacuzzi.